**E-Filed 7/22/2010**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| JOHN WRIGHT,<br><br>                Plaintiff,<br><br>     v.<br><br>BANK OF AMERICA, N.A., a Delaware corporations, BANK OF AMERICA HOME LOAN FINANCING, LP, a Texas limited partnership, f/k/a Countrywide Financial Corporation, COUNTRYWIDE FINANCIAL CORP., a Delaware corporation, COUNTRYWIDE HOME LOANS, INC., a New York corporation, and DOES 1 through 15, inclusive,<br><br>                Defendants. | Case Number CV 10-01723 JF (HRL)<br><br>**ORDER[1] GRANTING MOTION TO DISMISS AND REMANDING ACTION TO STATE COURT**<br><br>[re doc. no. 5] |

Defendants Bank of America, N.A. ("Bank of America"); Bank of America Home Loan Financing, LP ("BAC Home Loan"); and Countrywide Home Loans, Inc. ("Countrywide Home") move to dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6). The Court has considered the moving and responding papers and the oral arguments of counsel presented at

---

[1] This disposition is not designated for publication in the official reports.

1  the hearing on July 16, 2010. For the reasons discussed below, the motion to dismiss will be
2  granted with respect to Plaintiff's sole federal claim, and the remaining claims will be remanded
3  to the Santa Clara Superior Court.[2]

# I. BACKGROUND

## A. Factual Allegations

On or about August 16, 2004, Plaintiff John Wright purchased a home for $700,000. (Compl. ¶ 14.) Plaintiff obtained two loans from Countrywide[3] (Compl. ¶ 14.) The first loan was a 30-year loan fixed in the amount of $400,000 loan with an interest rate of 6.5%. (Compl. ¶ 14.) The second loan was a $300,000 home equity line of credit ("HELOC") with an interest rate of 7.75%. (Compl. ¶ 14.)

On or about June 1, 2005, Plaintiff refinanced the first loan, obtaining an adjustable rate loan with an interest rate of 8.5% rate from Countrywide. (Compl. ¶ 16.) He alleges that he relied upon Countrywide's encouragement and reputation in choosing to refinance. (Compl. ¶ 16.) However, in January 2007, Plaintiff became skeptical about his adjustable rate loan and decided to refinance with another fixed-rate loan. (Compl. ¶ 17.) He asserts that a Countrywide agent advised him to delay refinancing, and it was not until June 2007 that Countrywide allowed him to commence the refinancing process. (Compl. ¶ 19, 21.) On or about June 21, 2007, Countrywide refinanced the first loan at a 30-year fixed rate of 6.5%. (Compl. ¶ 28.) Plaintiff asserts that had Countrywide not delayed the refinancing, he would have received a lower fixed rate. (Compl. ¶ 29.)

On July 1, 2008, Bank of America acquired Countrywide. (Compl.¶ 5.) In October of 2008, Plaintiff attempted to modify his HELOC. (Compl. ¶ 30.) On November 18, 2008,

---

[2] Although Countrywide Financial Corp. ("Countrywide Financial") has not joined in the instant motion to dismiss, this disposition applies to all parties.

[3] At various points in this order, Bank of America and BAC Home Loan are to referred to collectively as "BOA," and Countrywide Financial and Countrywide Home are referred to collectively as "Countrywide."

1  Plaintiff received a loan modification contract from Countrywide. (Compl. ¶ 31.) Plaintiff
2  alleges that Countrywide gave him thirty days to sign the contract despite his expressed concern
3  that he did not understand the entire contract (Compl. ¶ 31-32). He signed the contract on
4  December 20, 2008. (Compl. ¶ 33.) He claims he did so because he feared losing the loan
5  modification, and because of Countrywide's insistence that he sign the contract without fully
6  understanding it. (Compl. ¶ 32.) The contract reduced Plaintiff's payments on the HELOC by
7  $61.71 per month. (Compl. ¶ 34.)

8        On February 17, 2009, unhappy with the result of the modification of the HELOC,
9  Plaintiff retained legal services in order to obtain another modification. (Compl. ¶ 36.) In April
10 2009, Bank of America consolidated and changed the Countrywide entities to BAC Home Loan.
11 (Compl. ¶ 5.) Between March and July 2009, Plaintiff did not pay his mortgage payments
12 because of financial hardship. (Compl. ¶ 48.) Plaintiff alleges that beginning in July 2009, BOA
13 called him to request payment on the HELOC. He also claims that BOA refused to provide a
14 loan modification as long as Plaintiff's present counsel represented him. (Compl. ¶ 49-50.)

15       Plaintiff alleges that in July 2009, BOA offered him a Home Affordable Modification
16 Trial Period Plan ("Trial Period Plan") that promised a modification of the HELOC provided that
17 Plaintiff complied with all of his obligations under the Plan (Compl. ¶ 52.) The Trial Period Plan
18 allegedly required Plaintiff to make three payments of $3,306.67 to BOA, with payments due on
19 the first of each month beginning on August 2, 2009. (Compl. ¶ 53.) The Trial Period Plan was
20 to be effective from August 2009 to October 2009. (Compl. ¶ 53.) The Plan also required
21 Plaintiff to submit a hardship application, a signed copy of his most recent tax returns, and proof
22 of income. (Compl. ¶ 53.) Plaintiff alleges that despite his sending all of the required documents
23 and making timely payments under the Trial Period Plan, BOA sent him a notice of intent to
24 accelerate on the HELOC on July 21, 2009. (Compl. ¶ 55-56.)

25       On or about October 23, 2009, shortly before the end of the trial period, BOA notified
26 Plaintiff that it could not locate his hardship application. (Compl. ¶ 58.) Plaintiff alleges that he
27 re-sent the document by fax and certified mail, and that he called BOA to provide tracking
28

1  numbers and to follow up on the loan process.  On October 31, 2009, Plaintiff was notified by
2  BOA that his tax return and proof of income were missing. (Compl. ¶ 61.)  Plaintiff alleges that
3  he faxed and sent these documents by certified mail. (Compl. ¶ 62.) On November 13, 2009,
4  Plaintiff received a letter from BOA informing him it still had not received his documents, but
5  that it would extend the trial period to December 2009 so that the documents could be
6  resubmitted. (Compl. ¶ 63.) Plaintiff contacted BOA on or about November 19, 2009 and again
7  was told to resubmit all of the documents. Plaintiff resubmitted the documents, but he did not
8  make any additional payments beyond the term of the Trial Period Plan. (Compl. ¶ 64-65.)

9        On February 16, 2010, BOA sent Plaintiff a letter refusing a loan modification and
10 requesting a lump sum payment of $40,000 to avoid foreclosure proceedings. (Compl. ¶ 66.)
11 Plaintiff alleges that when he spoke with BOA agents, they told him to disregard the notice and
12 that he was qualified for a loan modification. (Compl. ¶ 67.)

13       On or about April 21, 2009, BOA and Countrywide entered into a Home Affordable
14 Modification Program ("HAMP") contract, each as a participating servicer with Fannie Mae and
15 the United States Treasury. The HAMP contract required participating servicers to review all
16 eligible borrowers and make modifications available to qualified borrowers.

17 **B. Procedural History**

18       On March 18, 2010, Plaintiff filed suit in the Santa Clara Superior Court against Bank of
19 America, BAC Home Loan, Countrywide Home, and Countrywide Financial. He asserts six
20 claims for relief: (1) breach of the HAMP contract against all Defendants; (2) breach of contract
21 against BOA; (3) breach of the implied covenant of good faith and fair dealing against BOA; (4)
22 promissory estoppel against BOA; (5) intentional infliction of emotional distress against all
23 Defendants; and (6) violation of the California Business and Professions code §§ 17200, *et seq.*
24 for unfair competition against all Defendants. On April 22, 2010, Defendants removed the action
25 to this Court, and on April 29, 2010, Bank of America, BAC Home Loan, and Countrywide
26 Home moved to dismiss.

27
28

## II. MOTION TO DISMISS

**A. Legal Standards**

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of a motion to dismiss, "all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only a complaint that states "a plausible claim for relief survives a motion to dismiss." *Iqbal,* 129 S. Ct. at 1950.

The plausibility analysis is "context-specific" and is guided by the Court's "judicial experience and common sense," *id.,* and is limited to the face of the complaint and matters judicially noticeable, *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)*; N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't. of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995).

In assessing whether to grant leave to amend, the Court also considers "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (*quoting Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)). When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

**B. Federal Claim for Breach of HAMP Contract (Claim 1)**

Plaintiff asserts that he is a third-party beneficiary to the HAMP contract between Defendants and Fannie Mae. The HAMP contract requires servicers to review all eligible borrowers and to provide a loan modification to qualified borrowers in compliance with the HAMP contract and guidelines. Home Affordable Modification Program Guidelines (Mar. 4, 2009), http://www.financialstability.gov/roadtostability/homeowner.html (hereinafter "HAMP Guidelines"). The HAMP Guidelines include several requirements: (1) the loan to be modified must be a first-lien mortgage originated on or before January 1, 2009; (2) the loan must be delinquent or default must be imminent; (3) the borrower must have a monthly mortgage payment greater than thirty-one percent of his monthly income; and (4) the borrower must be able to document a financial hardship. *See also Williams v. Geithner*, No. 09-1959, 2009 WL 3757380 (D. Minn. Nov. 9, 2009) (outlining the HAMP program). Defendants argue that even if they did breach its HAMP contract with Fannie Mae, Plaintiff is not a third-party beneficiary of the contract and lacks standing to assert a HAMP-based breach of contract claim. The Court agrees.

"Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party [under the contract]. For guidance, we look to general principles for interpreting contracts. Before a third-party can recover under a contract, it must show that the contract was made for its direct benefit-that is an intended beneficiary of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 2000) (internal citations omitted). An intended beneficiary need not be named or identified specifically in a contract, but he "must fall within a class clearly intended by the parties to benefit from the contract." *Id.* at 1211. One way to determine such intent is to inquire whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him. Restatement (Second) of Contracts § 302(2)(1)(b) (1979) ("Restatement"). In the absence of such an intent, the beneficiary is simply an "incidental beneficiary" with no independent claim. *Id.* at § 302.

6

The Ninth Circuit observed in *Klamath* that "[p]arties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary. 'Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." 204 F.3d at 1211. *See* Restatement § 313(2). Additionally, clear intent is not shown simply by pointing to "a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third-party or even a showing that the contract 'operates to the third-parties' benefit and was entered into with them in mind." *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1244 (9th Cir. 2009) (internal quotations and citations omitted).

In *Klamath*, the Ninth Circuit concluded that a contract between a dam operator and the United States was "entered into with the irrigators in mind," but that the contract showed no intention on the part of the contracting parties to grant the irrigators enforceable rights. 204 F.3d at 1211-12. "[T]o allow the irrigators third-party beneficiary status would open the door to all users receiving a benefit from the Project achieving similar status, a result not intended by the Contract." *Id*. at 1212. The HAMP contract between Defendants and Fannie Mae obviously was entered into with the intent of aiding home-loan borrowers, but it is equally obvious that the contact does not secure an enforceable right for non-parties. A loan modification is never guaranteed. At most, the Guidelines guarantee only that an eligible borrower will be evaluated for a loan modification. *See* HAMP Guidelines. It is also clear that the right to such evaluation is enforceable only through an administrative process:

> [B]orrowers denied a loan modification can contact the Homeowner's HOPE Hotline and speak with a trained housing counselor regarding the HAMP program. If the counselor believes that the borrower's application was improperly denied, the counselor can refer the concern to the servicer's senior-level management. If that senior-level official cannot resolve the issue, the counselor can further escalate the case to a designated team at Fannie Mae whose responsibility includes resolving individual and systemic problems. In addition, to monitor participating servicers' compliance with the HAMP, Freddie Mac, at the direction of Treasury, instituted a second-look process in which it audits a sample of loan modification

> applications that have been denied to minimize the likelihood that borrower applications are overlooked or inadvertently denied. . . . Secretary of the Treasury issued S[upplemental] D[irective] 09-06 which requires, in part, servicers to furnish Treasury and Fannie Mae with the specific reason for denial.

*Williams,* 2009 WL 3757380, at *3.

Plaintiff directs the Court's attention to *Reyes v. Saxon Mortgage Services, Inc.*, No. 09-1366, 2009 U.S. Dist. LEXIS 125235, at *6 (S.D. Cal. Nov. 5, 2009), in which the plaintiff was permitted to proceed with a HAMP breach of contract claim under a third-party beneficiary theory. However, as the court observed in *Marks v. Bank of America*, No. 10-8039, 2010 U.S. Dist. LEXIS 61489, at *11 (D. Ariz. June 22, 2010), *Reyes* is distinguishable. Like the defendant in *Marks*, Defendants here are not obligated to modify Plaintiff's loan but to *evaluate* it. Indeed, Plaintiff asserts explicitly that his claim is based upon the Defendants "refusing to evaluate his. . . loan for modification. . . ." (Compl. ¶ 71.)  As in *Marks*, the HAMP contract "does not grant [p]laintiff the *right* to enforce the provisions of the agreement. Because [d]efendant was not required to admit or deny [p]laintiff's loan, only to *consider*, [p]laintiff could not have. . . reasonably believed that [d]efendant was obligated to modify her loan." *Marks*, 2010 U.S. Dist. LEXIS 61489, at * 11 (emphasis in original).  *See also Escobedo v. Countrywide Home Loans, Inc.,* No. 09-1557, 20099 U.S. Dist. LEXIS 117017, at *6 ("A qualified borrower would not be reasonable in relying on the Agreement as manifesting an intention to confer a right on him or her because the Agreement does not require Countrywide modify eligible loans.").  The Court concludes that Plaintiff is an incidental beneficiary and may not assert a third-party beneficiary claim for breach of the HAMP contract.  Nor does it appear that this defect could be cured by amendment.

**C. Supplemental Jurisdiction**

Plaintiff's HAMP claim provides the sole basis for federal question jurisdiction. While federal courts may exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case

or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), a court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction," *id.* § 1367(c)(3). Indeed, unless "considerations of judicial economy, convenience[,] and fairness to litigants" weigh in favor of the exercise of supplemental jurisdiction, "a federal court should hesitate to exercise jurisdiction over state claims." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966); *see also Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."). The Court declines to exercise its supplemental jurisdiction here and will remand the action to the state court on its own motion.

## IV. ORDER

Good cause therefor appearing, Defendants' motion to dismiss Plaintiff's HAMP claim is GRANTED, without leave to amend. All remaining claims are remanded to the Santa Clara Superior Court for further proceedings.

**IT IS SO ORDERED.**

DATED: 7/22/2010

_____
JEREMY FOGEL
United States District Judge

Case Number CV 10-01723 JF (HRL)
ORDER GRANTING MOTION TO DISMISS AND REMANDING TO STATE COURT
(JFEX2)